J-S32031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.H. A/K/A A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3493 EDA 2018 |

Appeal from the Order Entered November 2, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000154-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3494 EDA 2018 |

Appeal from the Decree and Order Entered November 2, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0002749-2016

BEFORE:  SHOGAN, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JULY 23, 2019**

Appellant, C.H. (Father), appeals from the decree and order involuntarily terminating his parental rights to A.J.H. (Child), born in March of 2011, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) (2), (5),

(8) and (b), and changing Child's permanency goal to adoption under the

Juvenile Act, 42 Pa.C.S.A. § 6351.[1]

The trial court accurately detailed the factual and procedural history of

this case as follows:

> [The Philadelphia Department of Human Services ("DHS")] originally became involved with this family on December 9, 2016, when DHS received a General Protective Services ("GPS") report that alleged Child was transported to DHS for placement after Father was taken to Methodist Hospital for choking on the antennae [sic] of a toy car that he swallowed; the home was very dirty with no furniture except a box spring in the living room covered with plastic bags; Child stated that herself, Mother, and Father slept on the box spring; the home was infested with bed bugs; Child was found to have head lice; Child was five years old; Child did not show any behavioral issues in school and showed no signs of developmental delays; Child was anemic, suffered from an iron deficiency, and had seasonal allergies; Child's older brother ("Sibling") resided with Paternal Grandmother; Paternal Grandmother indicated that she was unable to care for Child; [and] Father was active in his drug use with Mother. This report was determined to be valid. On that same day, DHS later learned that Child was found unsupervised outside of the home without shoes or a coat; Mother had asked Child to get scissors to cut the object out of Father's throat because he was choking and Child was afraid to do so because she thought she might kill Father; the home was in deplorable condition and Child stated that Father sometimes pulled bugs out of her hair. DHS spoke to Paternal Grandmother and she stated that there were ongoing concerns of substance use with Father and he was active in his drug use at that time. Paternal Grandmother also indicated that Father has a history of being transient. On that same day, DHS obtained an Order of Protective Custody ("OPC") for Child and she was subsequently placed in a foster home.

---

[1] Child's mother, S.S. (Mother), died in June of 2018.

A shelter care hearing was held for Child on December 12, 2016. Father was not present for this hearing. The trial court lifted the OPC and ordered the temporary commitment to stand. On December 22, 2016, the trial court adjudicated Child dependent, discharged the temporary commitment, and committed Child to DHS. The trial court referred Father to the Clinical Evaluation Unit ("CEU") for a dual diagnosis assessment, [and] three random drug screen[s] to include K2 and alcohol testing. Father was also referred to the Achieving Reunification Center ("ARC") and ordered to sign releases and comply with services.

On March 9, 2017, an initial Single Case Plan ("SCP") was created. Father's objectives were to follow up with the court-ordered dual diagnosis assessment; comply with the recommendations of the dual diagnosis assessment to address mental health issues; follow up with the court-ordered dual diagnosis assessment to address drug and alcohol issues; comply with the three random drug screens to include tests for K2 and alcohol; follow up with the ARC referral to address housing and outstanding utility arrears; and to participate in court-ordered supervised visits at Bethanna.

On April 4, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father had been minimally compliant with the permanency plan. The trial court referred Father to the CEU for a forthwith drug and alcohol screen with dual diagnosis and three random drug screens. Father was also referred to ARC and ordered to sign releases for discharge summaries from the hospital.

On June 5, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father had been moderately compliant with the permanency plan. The trial court ordered Father to sign all appropriate releases and enroll in parenting. Father was also referred to the Behavioral Health System ("BHS") for monitoring, and to the CEU for a forthwith drug screen, three random drug screens, a dual diagnosis assessment, and monitoring. On June 23, 2017, Father tested positive for benzodiazepines.

On September 5, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father was minimally compliant with the permanency plan. The trial court referred Father to the CEU for a forthwith drug

screen, monitoring, and three random drug screens prior to the next court date. Father was also referred to BHS for consultations and/or evaluations. Father was ordered to obtain his treatment plans and progress notes. Community Umbrella Agency ("CUA") was ordered to refer Father for parent/child interaction therapy. At Father's forthwith drug screen, Father tested positive for benzodiazepines.

On December 2, 2017, the SCP was revised. Father's objectives were to follow up with the court-ordered dual diagnosis assessment; comply with the recommendations of the dual diagnosis assessment to address mental health issues; enroll in and obtain mental health treatment services; follow up with the court-ordered dual diagnosis assessment to address drug and alcohol issues; comply with random drug screens and the Suboxone drug treatment program; sign releases for the programs; maintain housing with operable utilities; maintain a budget and discuss with the CUA case manager; and participate in court-ordered supervised visits at Bethanna.

On December 4, 2017, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father had been minimally compliant with the permanency plan. The trial court referred Father to the CEU for a forthwith drug screen, assessment, monitoring, and three random drug screens. Father was ordered to sign appropriate consents and to not have any contact with Child outside of the supervised visits. Father was also referred for a parenting capacity evaluation ("PCE"), a bonding evaluation, and to BHS for monitoring.

Child has been in DHS care since December [9], 2016. Father has failed to consistently comply with his objectives and comply with court orders throughout the life of the case. DHS filed a petition to involuntarily terminate Father's parental rights and change Child's permanency goal to adoption on March 1, 2018.

On April 9, 2018, a permanency review hearing was held for Child. Father was present for this hearing. The trial court referred Father to the CEU for dual diagnosis assessment, monitoring, a forthwith drug screen, and three random drug screens. Father was ordered to provide his prescriptions to the CEU. Father was ordered to continue attending supervised visits in the community with Child.

On June 25, 2018, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father was minimally compliant with the permanency plan. The trial court referred Father to the CEU for dual diagnosis assessment, monitoring, a forthwith drug screen, and five random drug screens. Father was ordered to provide documentation to the CEU regarding all prescriptions he takes and to sign appropriate releases. Father was also referred to the ARC for employment. Father's visits were reduced to bi-weekly supervised at the agency for two hours.

On September 19, 2018, a permanency review hearing was held for Child. Father was present for this hearing. It was reported that Father was minimally compliant with the permanency plan. The trial court re-referred Father to the CEU for a forthwith drug and alcohol screen, re-assessment, monitoring, and five random drug screens. Father was ordered to comply with all services and recommendations, and to sign releases. Father was also ordered to continue treatment at West Cayuga, provide verification of employment to CUA, and attend BHS for consultation, evaluation, and monitoring. Additionally, Father was ordered to continue bi-weekly, two-hour, supervised visits at the agency.

Trial Court Opinion, 2/1/19, at 1-4.

On March 1, 2018, CYF filed a petition to involuntarily terminate Father's parental rights and change Child's permanency goal to adoption. On November 2, 2018, the trial court held an evidentiary hearing on the petition. DHS was represented by counsel, Lindsay Cordes, Esquire. Father was present with his counsel, Carla Beggin, Esquire, and he testified on his own behalf. Child was represented by both a guardian *ad litem*, Katherine Morris, Esquire, and a child advocate/legal counsel, Lee Kuhlmann, Esquire, but Child was not present and did not testify. On the same day, the trial court entered its order terminating Father's parental rights to Child pursuant

to 23 Pa.C.S.A. § 2511(a)(1) (2), (5), (8) and (b), and changing Child's permanency goal to adoption. On November 30, 2018, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises three issues for our review:

1. Did the trial court err in terminating the Appellant's parental rights under Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8)?

2. Did the trial court err in finding that termination of Father's parental rights best served Child's developmental, physical and emotional needs under Section 2511(b)?

3. Did the trial court err in changing Child's goal to adoption?

Father's Brief at vi.

Preliminarily, we recognize:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In*

- 6 -

*re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Instantly, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b). To affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We therefore analyze the trial court's decision to terminate under Sections 2511(a)(2) and (b), which provide:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first examine the trial court's termination of Father's parental rights under Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

Further, this Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

In his first issue, Father argues that DHS failed to present clear and convincing evidence that the "causes of the incapacity, abuse, neglect or refusal will not be remedied." Father's Brief at 7. Father points out that he

completed parenting classes and anger management classes, was employed, completed random drug screens, attended the Suboxone clinic, and attended all of his visits. *Id.* Father further states that he was enrolled in and attending mental health treatment and medication management at Hall-Mercer. *Id.* Father claims his visits with Child went well, as Child "enjoyed the visits and looked forward to them." *Id.* at 8. Father states that Child told her child advocate that she wished to continue those visits and she did not seem to understand what adoption involved. *Id.* Thus, Father submits that there was "no evidence" to establish that the conditions causing Child's original placement were not remedied, and Father concludes that the trial court erred in terminating his parental rights pursuant to Section 2511(a)(2). *Id.* We disagree. Neither the record nor the law support Father's argument.

In finding grounds for termination of Father's parental rights pursuant to Section 2511(a)(2), the trial court stated accurately and at length:

> Throughout the time that Child has been in the custody of DHS, Father's SCP objectives were dual diagnosis and random drug screens, parenting, housing, employment, anger management, and supervised visitation with Child. Father was aware of his objectives. On multiple occasions, Father tested positive for benzodiazepines and marijuana. Father has a prescription for Alprazolam. Although Father has the prescription for Alprazolam, Father was unable to explain why his levels of benzodiazepines were inconsistent throughout multiple drug screens. Father admitted that he uses marijuana that he buys off the street. Father was ordered to participate in a dual diagnosis program, but he did not attend the CEU for an assessment until October 2018. Father scheduled an intake appointment for November 12, 2018, ten days after the

- 10 -

scheduled termination trial. Throughout the life of the case, the CEU has struggled to obtain any kind of treatment information or progress in order to monitor Father. Father has not successfully completed a drug and alcohol program. For the past ten years, Father has been engaged in a monthly Suboxone program, which includes monthly meetings with a therapist. Father refuses to provide a treatment plan about his Suboxone treatment. Father is currently engaged at Hall-Mercer for psychiatric care and medication management only. Father attends psychiatric appointments every six to eight weeks, but he has failed to engage in treatment for the drug component of the case. Father has been diagnosed with post-traumatic stress disorder and generalized anxiety disorder. Father has been referred for individual therapy to address trauma and grief, but Father is not currently engaged in any mental health therapy. Father does not have appropriate housing. Father was evicted from his home on October 19, 2018, and currently resides with a friend, but will not disclose the address. Father never completed housing at the ARC. Father obtained part-time employment in October 2018. Father never completed employment at the ARC. Throughout the life of the case, Father's employment has been inconsistent. Father completed parenting and anger management. Although Father completed anger management in September 2017, the trial court re-ordered Father to attend anger management after he was belligerent and argumentative at the September 19, 2018 permanency review hearing. Father continues to be aggressive and belligerent while in court. Father claims the system is "corrupt." Throughout the life of the case, Father's visits with Child [have] been modified on multiple occasions due to Father's behavior. In August 2017, Father's visits were suspended for approximately 60 days after Father discussed reunification with Child before the case was ready for reunification, which caused Child undue stress and anxiety. Father's visits were later reinstated in September 2017 to weekly, supervised, line-of-sight/line-of-hearing visits. Father's visits were eventually moved to supervised in the community, but those visits were reduced to bi-weekly, supervised at the agency after concerns of drug use by Father. Throughout the life of the case, Father's visits have been decreasing. Father has been minimally compliant with his goals. Child needs permanency, which Father cannot provide. Father has never asked about Child's medical appointments or daily needs. It is the foster parents that provide for Child's needs at all times. Father has demonstrated that he is unwilling to provide Child

with essential parental care, control, or subsistence necessary for her physical and mental well-being. The conditions and causes of Father's incapacity cannot or will not be remedied by Father. Father has attended almost all of the court hearings in this matter and is aware of his SCP objectives. Father had ample opportunity to put himself in a position to parent. Father's repeated and continued incapacity has not been mitigated.

Trial Court Opinion, 2/1/19, at 8-10 (citations to the record omitted).

Our review supports the trial court's findings. At the termination hearing, DHS presented the testimony of Gina Case, Bethanna CUA Case Management Director. Ms. Case testified that she worked with the family since December of 2016. N.T., 11/2/18, at 8. Ms. Case testified to the conditions which led to Child's removal, Father's objectives, and Father's failure to meet the objectives, such as addressing his significant substance abuse and mental health issues, and obtaining consistent employment and stable housing. *See id.* at 11, 16-17, 30-31, 40-41. In his own testimony, Father conceded his ongoing struggles with mental health and drug use. *See id.* at 43-44.

Consistent with the foregoing, the record supports the trial court's conclusion that Father's repeated and continued incapacity has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being, and that Father "cannot or will not remedy this situation." *See In re Adoption of M.E.P.*, 825 A.2d at 1272. This Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting

- 12 -

responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Thus, we proceed to examine whether termination was proper under Section 2511(b).

> Our Supreme Court has stated:
>
> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d at 267. "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Moreover:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

- 13 -

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Instantly, in arguing that termination was not in the best interest of Child's needs and welfare pursuant to Section 2511(b), Father simply asserts that he had consistent visits with Child "which went well," that Child looked forward to the visits, and Father and Child "had a loving relationship that benefitted his child." Father's Brief at 10-11. Again, the record does not support Father's argument.

In finding that Child's emotional needs and welfare favored termination pursuant to Section 2511(b), the trial court reasoned:

Throughout the life of the case, Father's visits with Child [have] been modified on multiple occasions due to Father's behavior. Father's visits have regressed. . . . Child always appears happy to reunite with her foster parents after her visits with Father. Father has never asked about Child's medical appointments or daily needs outside of the supervised visits. Child is currently placed in a pre-adoptive foster home where she has lived since early 2017. Child is bonded with her foster parents. Child looks to foster parents for support. Child refers to her foster parents as "mom" and "dad." The foster parents are very involved in Child's school and Child is engaged in [G]irl [S]couts, gymnastics, the environmental club, and the [S]panish club. Foster parents have participated in Child's child-interaction therapy before Child transitioned to individual therapy. Foster parents helped Child work through the loss of Mother after Mother's death. Child does not have a parent-child bond [or] a

necessary and beneficial bond with Father. Child was appointed legal counsel ("Legal Counsel") and Legal Counsel met with Child and had the chance to observe Child. Since Child is seven years old and can verbally communicate, Legal Counsel spoke with Child about adoption, reunification, and permanent legal custody ("PLC"). Child indicated that she is unsure of adoption because she likes to visit with Sibling when she attends visits with Father, although Sibling has never attended the visits with Father. Child is confused since Sibling is with Paternal Grandmother, who has custody of him. Legal Counsel indicated that Child was confused about adoption, reunification, and PLC. Legal Counsel also indicated that he does not believe that Child is mature nor sophisticated enough to understand the permanency of adoption. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Father. The DHS witness was credible.

Trial Court Opinion, 2/1/19, at 15-16 (citations to record omitted).

Our review confirms the trial court's recitation and thus its conclusion. The trial court specifically found that the DHS witness, Ms. Case, was credible. Ms. Case testified that although Child has a relationship with Father, the relationship is not one of a parent and child, and Child treats Father as a family friend. N.T. 11/2/18 at 27. Conversely, Ms. Case testified that Child has a parent-child relationship with her foster parents, who Child refers to as "mom" and "dad." *Id.* at 28. Child's foster parents are involved in Child's education and extracurricular activities, and Child looks to the foster parents for all of her needs. *Id.* Ms. Case stated that Child has a really good, concrete and stable family structure with foster parents. *Id.* at 29. Ms. Case further opined that Child needs permanency which Father is unable to provide, particularly in light of his ongoing mental

health and drug issues, and that Child would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 30.

On this record, the trial court properly concluded that termination of Father's parental rights serves Child's developmental, physical and emotional needs and welfare pursuant to Section 2511(b). While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Finally, we turn to Father's third and final issue challenging the trial court's change of Child's permanency goal to adoption. Our standard of review is the same abuse of discretion standard noted above. *See In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citing *In re R.J.T.*, 9 A.3d at 1190 for the proposition that the abuse of discretion standard applies in a dependency matter); *see also In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) ("In cases involving a court's order changing the

placement goal from "return home" to adoption, our standard of review is abuse of discretion.").

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

- 17 -

Here, the entirety of Father's argument against Child's goal change is that "[f]rom the time Child came into DHS care, Father visited consistently with his child, and was in mental health treatment . . . [and c]ertainly it is in the best interest of this child to be with her Father rather than strangers." Father's Brief at 12. This argument is belied by the record. In explaining the basis for its decision to change Child's goal to adoption, the trial court provided a comprehensive recitation, including the following excerpt:

> Father's SCP objectives were [mental health treatment] and random drug screens, parenting, housing, employment, anger management, and supervised visitation with Child. Father was aware of his objectives. On multiple occasions, Father tested positive for benzodiazepines and marijuana. . . . Although Father has the prescription for Alprazolam, Father was unable to explain why his levels of benzodiazepines were inconsistent throughout multiple drug screens. . . . Father was ordered to participate in a [mental health] program, but he did not [do so] until October 2018. . . . Father has been diagnosed with post-traumatic stress disorder and generalized anxiety disorder. Father has been referred for individual therapy to address trauma and grief, but Father is not currently engaged in any mental health therapy. Father does not have appropriate housing. . . . Throughout the life of the case, Father's employment has been inconsistent. . . . Although Father completed anger management in September 2017, the trial court re-ordered Father to attend anger management after he was belligerent and argumentative at the September 19, 2018, permanency review hearing. Father continues to . . . become[] aggressive and combative while in court. Throughout the life of the case, Father's visits with Child [have] been modified on multiple occasions due to Father's behavior. Father's visits have regressed. . . . Father has been minimally compliant with his goals. Child is currently placed in a pre-adoptive foster home where she has lived since early

> 2017. Child is bonded with her foster parents. . . .
> The foster parents are very involved in Child's school
> and Child is engaged in girl scouts, gymnastics, the
> environmental club, and the [S]panish club. . . .
> Father has never asked about Child's medical
> appointments or daily needs. The DHS witness was
> credible. . . . Child needs permanency.

Trial Court Opinion, 2/1/19, at 16-18 (citations to record omitted).

Our review of the record confirms the trial court's conclusion that the change of permanency goal to adoption was in Child's best interests. Father has failed to complete his parenting goals, which included appropriate housing, drug and alcohol treatment, mental health treatment and grief counseling. As such, Father was unable to provide for Child's permanency and safety. N.T., 11/2/18, at 41-42. We thus conclude that Child's goal change was proper.

In sum, we find no abuse of discretion by the trial court in terminating Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and changing Child's permanent placement goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/23/19

- 19 -